IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN VAN DRUFF,
19429 Olney Mill Road
Olney, MD 20832
    Plaintiff

vs.

Civil Action No. RWT 09CV2907

PNC BANK, NATIONAL ASSOCIATION,
249 Fifth Avenue
Pittsburgh, PA 15222

  Serve on:
CSC-Lawyers Incorporating Service Company
7 ST. PAUL STREET SUITE 1660
BALTIMORE, MD 21202

Defendant

_____ FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

OCT 27 2009

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

## Civil Complaint

Plaintiff JOHN VAN DRUFF hereby affirms all knowledge of the following in the matter of this Civil Complaint against PNC BANK, NATIONAL ASSOCIATION and states the following:

### Jurisdiction and Venue:

1-This Court has jurisdiction in this matter by 28 U.S.C. § 1331 due to the fact that the complaints are based upon 15 U.S.C. § 1681s-2 Subsection (b) as well as 15 U.S.C. § 1681n Subsection (a) (Federal Question).

2-Venue is appropriate as PNC BANK resides and can be found within this Court's Jurisdiction (28 U.S.C. § 1391 (b)).

### The Parties:

3-Plaintiff JOHN VAN DRUFF is an individual residing in the State of Maryland.

4-Defendant PNC BANK is a subsidiary of PNC FINANCIAL SERVICES, based in Pittsburgh, PA. PNC BANK does business in and is licensed to operate in the State of Maryland. PNC BANK provides, among other services, consumer loans as well as consumer banking services.

**Related Case and Persons:**

5-AUTOMOTIVE WARRANTY SERVICES, INC. (herein after "AUTOMOTIVE WARRANTY SERVICES") is a Illinois-based corporation. AUTOMOTIVE WARRANTY SERVICES does business in and is licensed to operate in the State of Maryland.

6-The Plaintiff contends that AUTOMOTIVE WARRANTY SERVICES is related to this case based on the fact that AUTOMOTIVE WARRANTY SERVICES provided an insurance plan to the Plaintiff

**Facts of the Case:**

*1-Description of the Origin of the Business Between the Plaintiff and PNC BANK*

7-On July thirteenth 2006, the Plaintiff purchased a 2000 Mitsubishi Eclipse (VIN # 4A3AC84L8YE045066) from Landmark Honda (herein after "the Vehicle"), an automotive dealership located in Landmark, VA. This purchase was, in part, financed by PNC BANK, who became the vehicle's lien holder and creditor.

*2-Description of the Contract, Including Amendments, Governing the Sale of the Vehicle, their relation to PNC BANK, and the Origin of the Business between the Plaintiff and AUTOMOTIVE WARRANTY SERVICES.*

8-Concurrently, the Plaintiff purchased Guaranteed Asset Protection (herein after "GAP") insurance from AUTOMOTIVE WARRANTY SERVICES. The function of GAP insurance is to cover the balance owed by the vehicle's owner to the creditor in the event that a financed vehicle is declared a "Total Loss" by the owner's automotive insurance company and the amount paid out by the owner's automotive insurance company to the creditor is less than the total amount owed by the owner to the creditor.

9-It is of particular importance to note that the GAP Contract Amendment (herein after "GAP Amendment") was an amendment to the *original* Contract (herein after "The Contract"), to which PNC BANK is party. Furthermore, the GAP Amendment specifically contains the language (Under Paragraph II of Guaranteed Asset Protection (GAP) Contract Amendment, titled "Gap Contract Amendment"):

"This Contract Amendment includes all provisions of this, as well as, the following page and *is binding on any creditor*" [emphasis added]

10-The GAP Amendment further contained the language (Under Section 2 of Guaranteed Amendment, titled "Assignment"):

"We agree to assign any and all rights under this Amendment to any subsequent assignee of the Contract covered by this Amendment. All holders and assignees of this consumer credit transaction are subject to all claims and defenses, which you could assert against us resulting from your purchase of Guaranteed Asset Protection. The assignee agrees, by acceptance of the Amendment to the Contract by assignment, to waive your liability for the difference between the amount owed (excluding late payments, cancelable insurance and/or other charges and any portion of a deficiency balance that resulted from an amount financed in excess of 150% of the retail value of the vehicle) under your contract ad the value of the vehicle as of the date of total loss of the vehicle"

### 3-Description of Accident Involving the Vehicle

11-On March thirteenth 2009, the Plaintiff was involved in an automobile accident (herein after "The Accident") in Montgomery County, MD. The responding law enforcement department was the Montgomery County Police Department of Montgomery County, MD, and the responding Officer was Officer Hess (Officer ID 2190; Officer based out of Wheaton, MD Station).

12-The Plaintiff filed a claim with the Plaintiff's automotive insurance company at the time, Progressive. Mr. Jarvis Robinson of Progressive handled the claim, and Mr. Keith Wicksteed, also of Progressive, determined the value of the vehicle. The Plaintiff's automotive insurance company determined the vehicle to be a "Total Loss" and issued a check in the amount of $4344.04 to PNC BANK on April 7th 2009, an amount that did not fully satisfy the balance of the loan.

### 4-Description of the Plaintiff's initial contact with the Defendants After The Accident

13-During the Month of April 2009, the Plaintiff attempted to purchase another car but was denied credit due, in part, due to adverse information on the Plaintiff's credit report inserted by PNC BANK. The Plaintiff, believing that since the Defendant as well as AUTOMOTIVE WARRANTY SERVICES had copies of the Original Contract as well as the GAP Contract Amendment, that AUTOMOTIVE WARRANTY SERVICES and PNC BANK would communicate with one another regarding resolution of the matter, proceeded to address matter somewhat informally at first.

14-The Plaintiff first brought the GAP Amendment to the attention of PNC BANK by informing the collectors calling from PNC BANK of the existence and perceived implications of The GAP Amendment via telephone. The Plaintiff informed the collectors that the total amount owed on The Vehicle would be paid by the GAP insurance plan and informed the collectors that the existence of the GAP insurance plan could be verified by reviewing PNC BANK'S own copies of The Contract and its Amendments.

15-This course of action, however, only satisfied PNC BANK temporarily. A repeating cycle of collection calls followed by the Plaintiff explaining the existence of the GAP insurance plan followed by a momentary pause in collection calls ensued until the late May 2009 when the Plaintiff spoke to a collector who advised the Plaintiff that telephone contact may be insufficient and to locate the GAP Contract Amendment, see if it contained instructions for filing a claim and to follow them as specifically as possible.

16-The Plaintiff acquired four (4) copies of the GAP Amendment from the records kept by Landmark Honda's Finance Department. The Plaintiff followed the instructions contained under Section 5 of GAP Contract Amendment, titled "Notification of Loss". This information was sent to PNC BANK and AUTOMOTIVE WARRANTY SERVICES on May 22nd 2009, along full legal-size copies of the GAP Amendment as well as a letter from the Plaintiff containing the contact information for both PNC BANK and AUTOMOTIVE WARRANTY SERVICES (in order for the two to exchange information such as the balance due as well as the Contract history).

### 5-Description of the Plaintiff's Subsequent Contact with the Defendants Following the Accident

17-The actions taken by the Plaintiff in the preceding paragraph did not result in either AUTOMOTIVE WARRANTY SERVICES fulfilling its obligation under the GAP Amendment nor did they result in PNC BANK fulfilling its obligation under the GAP Amendment to waive the Plaintiff's liability of the amount owed.  A "recovery specialist" by the name of Harry Krebs of PNC BANK began to send the Plaintiff threatening letters demanding payment. This culminated with a letter from Mr. Krebs to the Plaintiff dated July 24th 2009 in which Mr. Krebs includes the ominous warning: "If we do not hear from you within ten (10) days from the date of this letter, we will take additional steps to protect our interest".

18-Sensing that the situation with PNC BANK had become adversarial and thoroughly agitated at the constant harassment as well as adverse credit reporting on the part of PNC BANK, the Plaintiff drafted a firmly-worded, yet not unreasonably hostile letter to PNC BANK explaining the circumstances, requesting review of the situation by authorities at PNC BANK and warning that action could be taken against them if the situation was not resolved.

19-A second letter was drafted by the Plaintiff to AUTOMOTIVE WARRANTY SERVICES demanding fulfillment of the GAP Amendment Obligations. The letter to AUTOMOTIVE WARRANTY SERVIES also included the reasons why the Montgomery County Police Department did not file a report, as well as the contact information for the Montgomery County Police department and the responding officer's name, ID and station. The letter went on to point out that the exact wording of the GAP Amendment only requires a police report in the event that the vehicle owner does not have physical damage insurance.

20-A copy of letter to AUTOMOTIVE WARRANTY SERVICES was also sent to PNC BANK. Both letters also included copies of the GAP Amendment and were sent USPS Certified Mail on August 9th 2009 (with the tracking numbers for the parcels sent to PNC BANK and AUTOMOTIVE WARRANTY SERVICES being 7008 2810 0002 1665 1502 and 7103 3105 4900 2204 6483, respectively). The Plaintiff also sent a *limited* cease and desist to Mr. Krebs demanding that PNC BANK cease all contact with the Plaintiff attempting to collect the amount that should have been waived. This demand, however, included language specifically informing PNC BANK that it did not apply to contact attempt to work with the Plaintiff to resolve the insurance situation.

*6-Description of the Plaintiff's Subsequent Contact with Experian Regarding the Actions of PNC BANK and PNC BANK's Response*

21-On September 25th 2009, the Plaintiff obtained an online copy of his credit report from Equifax in order to verify whether or not adverse information inserted by PNC BANK after The Accident was still present. The Plaintiff's Equifax credit report indicated the presence of adverse information inserted after The Accident by PNC BANK , as well as that PNC BANK had listed the Plaintiff's account as a "charge off".

22-Also on September 25th 2009, the Plaintiff lodged a dispute with Equifax regarding the adverse information inserted by PNC BANK after The Accident. The dispute number was 9268013231. The justification for the dispute given to Equifax was that AUTOMOTIVE WARRANTY SERVICES, not the Plaintiff, was liable for the amount in question.

23- The Plaintiff subsequently received notification from Equifax (dated September 30th, 2009) that, upon receipt of the dispute from Equifax, PNC BANK returned information indicating that the Plaintiff was liable for the full deficiency balance.

### Claims and Legal Justification:

24- 15 U.S.C. § 1681, *et. seq.* consists of Federal rules pertaining to the reporting of consumer credit information. The Purpose of these statutes are given in 15 U.S.C. § 1681 (b):

"It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."

25-The Plaintiff draws attention to the emphasized importance of "accuracy" present in 15 U.S.C. § 1681 (b). The Plaintiff contends that "accuracy", with respect to credit reporting could be taken as a measure of compliance with the terms of a credit contract (to wit; adverse information pertaining to a matter in which all parties were in compliance with the terms of the credit contract would be "accurate", whereas adverse information pertaining to a matter in which one or more parties were not in compliance with the terms of the credit contract would be "inaccurate")

26-The Plaintiff alleges that, due to the fact that PNC BANK, was bound to the GAP Amendment, that PNC BANK'S insertion of adverse information on the Plaintiff's credit report was inaccurate. This inaccuracy arises from PNC BANK'S disregard for its obligation to transfer liability to AUTOMOTIVE WARRANTY SERVICES as per the GAP Amendment.

27-15 U.S.C. § 1681s-2 Subsection (b) outlines the responsibilities of furnishers upon receipt of a dispute from a Credit Reporting Agency initiated by a consumer:

"
(b) Duties of furnishers of information upon notice of dispute
(1) In general
After receiving notice pursuant to section 1681i (a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—
(A) conduct an investigation with respect to the disputed information;
(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i (a)(2) of this title;
(C) report the results of the investigation to the consumer reporting agency;
(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—
    (i) modify that item of information;
    (ii) delete that item of information; or
    (iii) permanently block the reporting of that item of information.
"

28-PNC BANK'S decision retain the adverse information on the Plaintiff's credit report (inserted after The Accident) is evidence of violation of 15 U.S.C. § 1681s-2 Subsection (b). This subsection mandated PNC BANK to conduct an investigation of the disputed information on the Plaintiff's credit report due to the fact that the dispute came from Equifax, a consumer reporting agency. By reporting to Equifax that Plaintiff, and not AUTOMOTIVE WARRANTY SERVIES, was liable, PNC BANK indicated that they had conducted an investigation and the information reported to Equifax on September 30th 2009 were the "results" of the investigation.

29-If the Court accepts the Plaintiff's contention (found in Paragraphs 25-26 of this Complaint) that adverse information reported against the Plaintiff by PNC BANK following PNC BANK's failure to transfer liability from the Plaintiff to AUTOMOTIVE WARRANTY SERVICES is inaccurate, then PNC BANK'S refusal to remove such information following a dispute from a consumer reporting agency would be a violation of 15 U.S.C. § 1681s-2 Subsection (b).

30-15 U.S.C. § 1681s-2 Subsection (c) outlines the limitations on liability for violations of 15 U.S.C. § 1681s-2 Subsection (c).:

"

(c) Limitation on liability
Except as provided in section 1681s-2 (c)(1)(B) of this title, sections 1681n and 1681o of this title do not apply to any violation of—
(1) subsection (a) of this section, including any regulations issued thereunder;
(2) subsection (e) of this section, except that nothing in this paragraph shall limit, expand, or otherwise affect liability under section 1681n or 1681o of this title, as applicable, for violations of subsection (b) of this section; or
(3) subsection (e) of section 1681m of this title.
" [emphasis added]

31-15 U.S.C. § 1681n Subsection (a) establishes certain civil liabilities that may be claimed for violations of 15 U.S.C. § 1681s-2:

"(a) In general
Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
(1)
(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or
(B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;

(2) such amount of punitive damages as the court may allow; and
(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court."

32-In the case of Nelson v. Chase Manhattan (No. 00-15946; U.S. Court of Appeals, Ninth Circuit), the Court issued a ruling establishing precedent for individual consumers to sue persons furnishing inaccurate information to consumer reporting agencies for violations of 15 U.S.C. § 1681s-2 Subsection (b), stating in the Opinion that the dispute process acts as a "filter" for unscrupulous suits. This Opinion stated further that, of the three parties (the consumer, the furnisher and the consumer reporting agency) involved in a consumer report, that the 1996 Amendment to 15 U.S.C. § 1681n (removing "Any consumer reporting agency or user of information which" and inserting "(a) In general, any person who") pertains specifically to furnishers, as consumer reporting agencies were already suable.

33-The Plaintiff contends, and prays the court accepts, that the facts and statutes cited in this Claim establish the Plaintiff's right to seek damages, in accordance with 15 U.S.C. § 1681n" from PNC BANK for PNC BANK'S violations of 15 U.S.C. § 1681s-2 Subsection (b).

34-Pursuant to 15 U.S.C. § 1681n Subsection a (1)(A), the Plaintiff seeks statutory damages in the amount of $1,000 from PNC BANK and requests this Court consider the matter.

35-Pursuant to 15 U.S.C. § 1681n Subsection a (1)(B), the Plaintiff seeks punitive damages in the amount of $10,000 from PNC BANK and requests this Court consider the matter.

36-Pursuant to 15 U.S.C. § 1681n Subsection a (1)(C), the Plaintiff seeks compensatory damages related to the filing of this Claim in the amount of $350 from PNC BANK and requests this Court consider the matter

37- The Plaintiff also seeks Injunctive relief from this Court in the form of an Order mandating PNC BANK contact all three major U.S. consumer reporting agencies (Experian, Equifax and TransUnion) and remove all adverse information inserted by PNC BANK after The Accident and requests this Court consider the matter.

**Extent of Damages**

38-The Plaintiff incurred several forms of damage as a result of PNC BANK'S handling of this matter. Damages to the Plaintiff's credit prevented the Plaintiff from purchasing a replacement vehicle. Due, in part, to adverse information inserted to the Plaintiff's credit report by PNC BANK, the Plaintiff's father, Lawrence Van Druff, eventually purchased a vehicle for the Plaintiff (the Plaintiff pay's the Plaintiff's father who, in turn, pays the creditor on the new vehicle). Introducing another party into the buying process significantly extended the buying process. This resulted in the Plaintiff and members of the Plaintiff's family working out date(s) and time(s) for shared car usage during the buying process.

39-The Plaintiff was also harassed repeatedly via repeated phone calls to his cell phone from PNC BANK, even after PNC BANK had been notified numerous times of the existence of the GAP Amendment. It is worth noting that PNC BANK called the Plaintiff from a number that showed up as "Unknown" on the Plaintiff's Cell phone- effectively removing the Plaintiff's option to not receive these calls via blocking while at work, school, or social functions without

silencing the Plaintiff's phone. PNC BANK also harassed the Plaintiff indirectly through calls to the Plaintiff's father's home number, even after being asked to stop.

40-The most insidious of the damages incurred by the Plaintiff was the sense that PNC BANK was attempting to veritably "extort" the Plaintiff out of a payment without regard to the GAP Amendment to which PNC BANK was bound. PNC BANK'S failure to address the provisions of the GAP Amendment while aggressively pursuing collections even after being made aware of the GAP Amendment by the Plaintiff on several occasions has led the Plaintiff manifesting a particular opinion of PNC BANK.

41-This opinion is of an entity that will harass, threaten, humiliate and cause damage to a person in an attempt to collect a payment, an entity that cares little about contracts "inconvenient" to itself but takes almost viscous steps to ensure customers comply with more contracts "beneficial" to itself, an entity that doesn't want to talk to you about the nature and validity of the debts it claims to be owed but can and will talk to you repeatedly about immediate payment of these debts.

42-The Plaintiff asserts to the Court that this Claim was not the Plaintiff's first course of action. Despite being annoyed, abused, angered, etc… by PNC BANK'S handling of this matter, the Plaintiff exhausted all other options before resorting to a civil complaint. Even after the Plaintiff ended the August 6th 2009 call from PNC BANK stating, "I'm filing a lawsuit", the Plaintiff chose to file a formal complaint with PNC BANK first. After the August 9th 2009 letter to PNC BANK failed to resolve the situation, the Plaintiff filed a complaint with Experian prior to filing suit. This Claim was the Plaintiff's *last* course of action, used only after all other courses of action failed to resolve the matter.